# EXHIBIT A

**Phillips & Paolicelli, LLP**
747 3rd Avenue, 6th Floor
New York, New York, 10017
Phone: 212-388-5100;
Fax 212-388-5200
Attorneys for Plaintiff
By: Steven Phillips, Esq.
    Victoria E. Phillips, Esq.
    Melissa Stewart, Esq.
    (Pro hac vice to be applied for)

**Szaferman Lakind**
  **Blumstein & Blader, P.C.**
101 Grovers Mill Road, Suite 200
Lawrenceville, New Jersey 08534
Phone: 609-275-0400;
Fax: 609-275-4511
Attorneys for Plaintiff
By: Arnold Lakind, Esq.
    (Attorney ID# 002581973)
    Robert Lytle, Esq.
    (Attorney ID# 046331990)

**Cooney & Conway**
120 N. Lasalle Street, Suite 3000
Chicago, Illinois 60602
Phone:  312-236-6166;
Fax 312-236-3029
Attorneys for Plaintiff
By:  Kevin Cooney, Esq.
(Pro hac vice to be applied for)
     Michael Lubeck, Esq.
(Pro hac vice to be applied for)

| | |
|---|---|
| ERIN ALBRITTON<br><br>                    Plaintiff,<br><br>v.<br><br>A  CLEMENTE, INC.; ANTHONY<br>CLEMENTE, INC.; SOLVAY<br>SPECIALTY POLYMERS, USA, LLC;<br>SOLVAY SOLEXIS, INC.; ARKEMA,<br>INC.; E.I. DU PONT DE NEMOURS<br>& COMPANY; THE CHEMOURS<br>COMPANY; THE CHEMOURS COMPANY<br>FC, LLC; THE 3M COMPANY; AND<br>JOHN DOE ENTITIES #1-20<br><br><br>                    Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION - SALEM COUNTY<br>DOCKET NO. SLM-L-187-21<br><br><br>          CIVIL ACTION<br><br><br><br><br><br><br>     **FIRST AMENDED COMPLAINT**<br>        **AND JURY DEMAND** |

#5700017v1

Plaintiff, Erin Albritton, by way of Amended Complaint against A. Clemente, Inc., Anthony Clemente, Inc., Solvay Specialty Polymers, USA, LLC, Solvay Solexis, Inc., Arkema, Inc., E.I. Du Pont De Nemours & Company, The Chemours Company, The Chemours Company FC, LLC, The 3M Company, and John Doe Entities #1-20 (collectively "Defendants") says that:

**A.    The Nature of the Action**

1.    This is a civil action brought by Erin Albritton, who seeks to recover damages for personal injuries suffered by Plaintiff.

2.    Plaintiff seeks to recover damages for personal injuries suffered by Plaintiff including but not limited to:

      a.    Ovarian cancer;

      b.    Removal of ovaries;

      c.    Removal of fallopian tubes;

      d.    Chemotherapy;

      e.    Profound pain and suffering and mental anguish; and

      f.    Loss of the ability to enjoy life's pleasures.

3.    Those injuries were foreseeably caused by the Defendants' misconduct, including their intentional discharge, use, and/or disposal of toxic and dangerous chemicals and substances.

4.    These chemicals and substances include but are not limited to:

a.   poly- and perfluoroalkyl substances ("PFAS"), (among them perfluorononanoic acid ("PFNA"), perfluorooctanoic acid ("PFOA"), and perfluorooctanesulfonic acid ("PFOS"), as well as their replacement compounds, including but not limited to "GenX").

b.   halogenated hydrocarbons (e.g., dichloromethane, or methylene chloride, trichloroethylene, perchlorethylene);

c.   heavy metals (e.g., lead, mercury, arsenic, copper, antimony);

d.   freons;

e.   industrial alcohols and solvents (e.g., acetone, toluene, acetonitrile, ethyl acetate, heptane, hexane, isopropynol, benzene, ethylbenzene, xylene);

f.   numerous mixtures and wastes consisting of multiple compounds, substances, and/or products (e.g., paints, dyes, fuels, explosives, ammunition, hereafter collectively "mixtures" or "waste");

g.   polycyclic aromated hydrocarbons ("PAHs"); and

h.   particulate matter and airborne waste.

5.   These substances and other toxins, (hereafter "toxins") individually and in mixtures have the capacity to cause:

    a.    adverse reproductive, neurological, and developmental outcomes including but not limited to birth defects, developmental delays, intellectual disability, autism spectrum disorders, genetic damage, embryonic tumors, and effect on infant birth weights;

    b.    liver, kidney, and immunological disorders and illness;

    c.    impaired resistance to infectious disease;

    d.    cardiovascular disease and disorders;

    e.    metabolic diseases and disorders;

    f.    increased cholesterol levels;

    g.    endocrine and thyroid disease and disorders and hormone disruption;

    h.    asthma, allergies, and respiratory disease;

    i.    skin disorders;

    j.    orthopedic injuries;

    k.    gastrointestinal illness;

    l.    cancers and severe non-malignant disorders.

6.    Further, these toxins have the capacity to act in an additive or synergistic fashion such that mixed exposures enhance or even multiply their capacity to inflict and accelerate the harm(s) of the type described above.

7.    In addition, the mechanisms by which these relevant toxins inflict harm are many, and include:

     a.    apoptosis (cell death);

     b.    oxidative stress;

     c.    genotoxicity (spontaneous or de novo mutation);

     d.    epigenetic change;

     e.    diminished cellular nourishment;

     f.    impaired cell to cell communication;

     g.    endocrine disruption;

     h.    impaired or excessive immune responses;

     i.    intrauterine growth retardation;

     j.    impaired organogenesis; and

     k.    the capacity to cross placental and brain barriers.

8.    There are no safe levels of exposures to these toxins, especially with mixed and prolonged exposures.

9.    While exposures to these toxins (e.g., quantum of exposure, duration(s) of exposure and timing of exposure relative to the adverse outcome) typically operate along a biological gradient (dose-response), such that increases in quantum, duration or timing increase the potential for harm, even a single exposure at vanishingly small quanta, unfortunately timed, has the capacity to cause the above described and other injuries.  Accordingly, although the calculation of the precise dose of exposure to each toxin or mixture (and to the aggregate of all exposures) is not

5

presently known, these exposures, from both a qualitative and
quantitative perspective, are more than sufficient to have caused
the injured Plaintiff's injuries.

10. As a consequence of Defendants' intentional, knowing,
reckless, grossly negligent, and negligent acts and omissions
described herein, resulting in the contamination of the
environment, water, air, and soil, including but not limited to
Plaintiff's water supply, Plaintiff seeks to recover compensatory
and punitive damages for the personal injuries suffered by
Plaintiff.

11. The external routes of exposure which caused the
injuries for which Defendants are responsible, involved airborne
dispersion, groundwater, surface water, contamination of domestic
water supplies, soil contamination, and vapor intrusion in and
around the Plaintiff's residence and adjacent neighborhoods.

**B.   The Parties:**

12   Since approximately 2002, Plaintiff, Erin Albritton,
has resided at and been domiciled at 16 Two Penny Run West,
Pilesgrove, New Jersey (the "Property").

13. Defendant, Anthony Clemente, Inc. (a/k/a "A. Clemente,
Inc.," hereafter referred to as "Clemente") is a corporation
organized under the laws of the State of New Jersey and is the
owner of block 247, lots 1 and 2 also known as 211 South

Pennsville Auburn Road, in the Township of Carneys Point, County of Salem, State of New Jersey (the "Clemente Property").

14.   The Clemente Property has been used for the disposal of hazardous waste generated by E.I. Du Pont de Nemours & Company and others, which hazardous waste has migrated on to Plaintiff's property causing exposure to a variety of harmful substances and the profound personal injuries described above sustained by Plaintiff.

15.   Defendant Solvay Specialty Polymers, USA, LLC ("Solvay USA") is a corporation duly organized under the laws of the State of Delaware with its principal place of business located in Houston, Texas.

16.   Defendant Solvay Solexis, Inc. ("Solvay Solexis") is the predecessor of Solvay USA and was a corporation duly organized under the laws of the State of Delaware with its principal place of business located in Houston, Texas.

17.   Defendants Solvay USA and Solvay Solexis will collectively be referred hereinafter as "Solvay".

18.   Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business at 2000 Market Street, Philadelphia, PA 19103.

19.   Defendant E.I. du Pont de Nemours & Company ("DuPont") is a corporation duly organized under the laws of the State of

Delaware with its principal place of business located at 974 Centre Road, Wilmington, DE 19805.

20.  Defendant The Chemours Company ("Chemours Co.") is a corporation duly organized under the laws of the State of Delaware with its principal place of business located at 1007 Market Street, Wilmington, DE 19899.

21.  Defendant The Chemours Company FC, LLC ("Chemours FC") is a corporation duly organized under the laws of the State of Delaware with its principal place of business located at 1007 Market Street, Wilmington, DE 19899.

22.  Defendants Chemours Co. and Chemours FC will collectively be referred hereinafter as "Chemours".

23.  Defendant The 3M Company ("3M") is a corporation duly organized under the laws of the State of Minnesota with its principal place of business at 2501 Hudson Road, Maplewood, MN 55144.

24.  Defendants John Doe Entities  #1-20 are fictitious names of corporations, companies, partnerships, or other business entities or organizations whose identities  cannot be ascertained as of the filing of this Amended Complaint, certain of which are successors to, predecessors or alter egos of, or are otherwise related to, the identified Defendants in this matter or which are otherwise liable pursuant to the causes of action set forth herein as a result of their intentional, knowing, reckless and/or

negligent release, discharge, storage and/or disposal of the toxic
and hazardous chemicals described in paragraph 4 above into the
surrounding air, soil and water, thereby causing the contamination
of the air, soil, surface water, and ground water in and around
Plaintiff's residence and adjacent neighborhoods.

## C.   Background

25.  Plaintiff suffers from profound personal injuries
described above.

26.  These injuries were all proximately caused by the above
Defendants' misconduct, including their intentional, reckless
and/or negligent discharge, storage, and/or acceptance for
disposal of toxic and hazardous chemicals including, but not
limited to the toxins described in paragraph 4 above.

27.  With respect to the PFAS, PFOA PFNA and PFOS chemicals,
the United States Environmental Protection Agency ("EPA") has
identified 3M as the dominant global producer of PFOA and related
chemicals.

28.  3M manufactures at least eighty-five (85%) percent of
total worldwide volumes of PFOA and related chemicals.

29.  Poly- and perfluoroalkyl substances ("PFAS") are man-
made chemicals.

30.  PFAS have been manufactured and used in the United
States since the 1940s.

31.  PFAS have fire-resistant properties.

32.   PFAS act as oil, grease, and water repellants.

33.   PFAS have been used to make many household products such as Teflon®, Gore-Tex® Stainmaster®, Scotchgard®, and Tyvek®.

34.   PFAS compounds are a substantial threat to the environment and human health.

35.   Some PFAS have been classified as carcinogenic.

36.   Studies report that PFAS exposure  and exposures to the other toxins have the capacity to cause *inter alia*:  testicular cancer, kidney cancer, liver cancer, brain cancer, lymphomas, leukemia, breast cancer, lung cancer, autoimmune disorders, endocrine disorders, developmental and genetic defects to fetuses, developmental defects to breastfed babies, reduced vaccine response, neurological damage, central nervous system damage, cognitive impairment, increased cholesterol, and increased liver enzymes and a host of other disorders including those suffered by the injured Plaintiff.

37.   PFAS compounds and certain other toxins are resistant to degradation.

38.   PFAS compounds and certain other toxins persist indefinitely in the environment.

39.   PFAS compounds and certain other toxins or their metabolites bioaccumulate in living tissue.

40.   People who consume PFAS and other toxins via drinking water and are otherwise exposed accumulate increasing

concentrations of PFAS and other toxins or their metabolites in their blood.

41. For decades, Defendants and their predecessors in interest have known (or should have known) of the highly toxic characteristics of PFAS and other toxins.

42. The New Jersey Department of Environmental Protection ("NJDEP") has devoted and is continuing to identify and investigate the presence of PFAS and other toxins in New Jersey's environment, as well as to monitor, treat, clean up, and/or remove PFAS or other toxins in impacted areas.

43. Chemicals including but not limited to "GenX" have been substituted by Defendants (other than Clemente) in lieu of their PFAS chemicals.

44. These replacement chemicals are being inaccurately touted as short-chain and having shorter half-lives.

45. These replacement chemicals do not break down in the environment.

46. PFAS compounds and their replacement chemicals have also been detected in drinking water, groundwater, and surface waters.

47. In 2009, EPA issued preliminary health advisory values for PFOA and PFOS in drinking water of 400 parts per trillion ("ppt") and 200 ppt, respectively.

48.   In 2016, EPA lowered its advisories for PFOA and PFOS to 70 ppt collectively total in further recognition of their extreme danger at even the most miniscule doses.

49.   In 2018 the United States Department of Health and Human Services, Agency for Toxic Substances and Disease Registry ("ATSDR") released draft minimum risk levels of 21 ppt for PFOA and PFNA, and 14 ppt for PFOS.

50.   NJDEP has adopted a specific groundwater Quality Standard ("GWQS") of 10 ppt for PFNA and a Maximum Contaminant Level ("MCL") of 13 ppt.

51.   NJDEP added PFNA to its List of Hazardous Substances on January 16, 2018.

52.   On March 13, 2019, the NJDEP established interim specific groundwater quality criteria for PFOA and PFOS of 10 ppt.

53.   NJDEP has proposed adding PFOA and PFOS to the List of Hazardous Substances.

54.   NJDEP also issued a Statewide PFAS Directive, Information Request and Notice to Insurers against Defendant Solvay Specialty Polymers USA, LCC, Defendant Solvay Solexis, Inc., Defendant E.I. du Pont de Nemours & Company, Dowdupont, Inc., DuPont Specialty Products USA, LLC, Defendant The Chemours Company FC, LLC, Defendant The Chemours Company, and Defendant The 3M Company "to notify them that the Department believes them to be responsible for the significant contamination of New Jersey's

natural resources, including the air and waters of the State, with poly- and perfluoroalkyl substances ("PFAS")…" which encompass the air and water utilized by Plaintiff.

55.  The other toxins have also been the subject of repeated governmental evaluation and regulation by agencies of the federal government, the State of New Jersey, other state governments, and foreign regulatory bodies. Defendants are believed to have violated such regulations at relevant times and in relevant localities.

**D.    Solvay and Arkema's West Deptford Facility**

56.  Solvay has been the owner and operator of a manufacturing facility located at 10 Leonard Lane, West Deptford, NJ 08085 ("the West Deptford facility") from 1990 to the present.

57.  Before 1990, Arkema owned and operated the West Deptford facility.

58.  Solvay manufactured polyvinylidene fluoride ("PVDF"), which is another PFAS compound, at the West Deptford facility.

59.  PVDF is a specialty plastic used in conjunction with lithium batteries, medical and defense uses, semi-conductors, or other instances when a higher level of purity is required.

60.  On information and belief, Arkema manufactured PVDF and other high- performance materials at the West Deptford facility prior to 1990.

61.   Solvay's West Deptford facility was considered to have the second highest capacity in the world for purposes of using Surflon S-11 to make PVDF, which is composed of approximately 74% PFNA.

62.   In connection with its operations, Solvay released vast amounts of PFNA and other toxins into the surrounding air, soil and water contaminating its site, off-site properties including Plaintiff's Property, and New Jersey's natural resources with the PFNA chemical.

63.   At relevant times, Solvay also used sodium perfluorooctanoate (NaPFO) as a surfactant at the West Deptford Facility, which was supplied to it by 3M.

64.   NaPFO degrades into PFOA.

65.   As a result of its operations, Solvay released vast amounts of PFOA into the surrounding air, water and soil contaminating the site, off-site properties including the Property, and contaminating New Jersey's natural resources with the PFOA chemical.

66.   Since at least 1991, Defendant Solvay knew that it was discharging large amounts of PFNA and other toxins into the environment from their West Deptford, New Jersey facility located at 10 Leonard Lane, West Deptford, NJ 08086.

67.   Prior to 1990, and at relevant times, as a result of their operations, Arkema released massive amounts of PFOA into the

14

surrounding air, soil and water contaminating its site, off-site properties including the Property, and contaminating New Jersey's natural resources with the PFOA and other relevant toxins

**E    DuPont and Chemours' Chamber's Works Facility**

68.   For over a century, from 1891 to 2015, DuPont owned and operated Chambers Works, 67 Canal Road and Route 130, located in Pennsville and Carneys Point Townships, New Jersey.

69.   DuPont produced, used, and discharged into the environment approximately 1,200 separate chemicals, pollutants, and other hazardous substances from the Chambers Works facility. Upon information and belief, in addition to the PFOA/PFAS chemicals, many, if not most of the other toxins discussed above were also wrongfully produced, used and discharged into the environment from this facility.

70.   PFOA was used at Chambers Works beginning in the late 1950s to, among other things, manufacture fluoroelastomers, perfluoroelastomers and specialty fluoroelastomers used in a variety of consumer and other products for their chemical non-stick and heat-resistant properties.

71.   Telomers were used and manufactured at Chambers Works.

72.   PFOA is a by- product of the telomer manufacturing process.

73.   At relevant times, 3M supplied DuPont with PFOA.

74.  DuPont also accepted large quantities of PFOA-containing waste from off-site facilities and discharged this and other toxic waste, along with wastewater from its on-site PFOA- related processes, through its wastewater treatment plant.

75.  As a result of its operations, for decades, DuPont released massive amounts of PFOA as well as other PFAS, including PFNA, and other toxins from Chambers Works into the surrounding air, water and soil, contaminating the site, off-site properties including the Property, and contaminating New Jersey's natural resources.

76.  In 2015, DuPont transferred its Chambers Works facility to Chemours.

77.  DuPont continued to operate at the location pursuant to an industrial lease through which DuPont was the tenant and Chemours FC was the landlord.

78.  Chemours accepted the transfer of DuPont's Chambers Works facility with the knowledge that the site had been wrongfully contaminated with PFAS and other toxic substances.

79.  Chemours accepted the transfer of DuPont's Chambers Works facility with the knowledge that it was discharging PFAS and other toxins into the surrounding air and water contaminating off-site properties including the Property, and contaminating New Jersey's natural resources.

80.   Sampling of residential drinking water wells in the surrounding area revealed contamination many miles away from the Chambers Works facility, with a substantial number of wells exceeding applicable screening criteria for concentrations of PFOA, PFNA, or PFOA and PFOS combined.

81.   NJDEP has declared that: "DuPont has not been working in good faith to address the contamination it released into New Jersey's environment. Instead, DuPont knowingly concealed the true nature of the chemicals it discharged, while simultaneously moving forward with a corporate reorganization that moved its 'performance chemicals' business (including its PFAS-related product lines), the [Chambers Works facility] itself, and the associated liabilities to Chemours [Co.] and Chemours FC and away from DuPont (and tens of billions of dollars of its assets). DuPont has concealed from the Department and the community the extent and nature of the environmental injuries its contaminants caused."

82.   NJDEP also declared that "[b]oth DuPont and The 3M Company ("3M") put their profits above the public health, safety, and the environment of New Jersey."

83.   DuPont and 3M committed acts and omissions with respect to PFAS and other toxins with actual malice and/or with a wanton and willful disregard of people who foreseeably might be harmed by those acts or omissions.

84.   This conduct was performed with greed and in callous disregard of the public health as well as Plaintiff's health and well-being, in order to maximize profit, avoid necessary expense, to promote sales of their products and to reduce or eliminate their obligations to otherwise remediate or prevent the discharge of PFAS into the environment and Plaintiff's private wells.

85.   From studies of its own workers, Defendant, DuPont, knew that PFOA and other toxins were harmful to humans both alive and in utero.

86.   Defendants, DuPont, knew that PFOA and other toxins were being discharged into the environment, including the air, soil, groundwater, surface water and drinking or household water supply.

87.   Defendants DuPont failed to disclose the risks to regulators, the public or the Plaintiff.

88.   In a 2003 report on Chambers Works, DuPont disclosed that PFOA was present in groundwater throughout the facility and at the perimeter up to 46,000 ppt.

89.   However, DuPont falsely characterized those results as showing "very low levels" and that "PFOA is being contained on-site by the site groundwater containment system."

**F.   3M**

90.   From as early as the 1970s, Defendant, 3M, knew that PFOA and PFOS and other toxins were harmful to people and the

environment based on its own studies and review of relevant scientific and medical literature.

91. Defendant 3M knew that PFAS and other toxins had the capacity to and foreseeably would leach into groundwater and contaminate the environment.

92. As early as 1960, an internal 3M memo admitted that its chemicals "[would] eventually reach the water table and pollute domestic wells."

93. 3M actively sought to suppress scientific research on the hazards associated with PFAS products and other toxins.

94. 3M intentionally mounted a campaign to control the scientific dialogue on the exposure, fate, effects, human health, and environmental risks of its PFAS products and other toxins.

95. At least one scientist funded by 3M reported his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

**G. Defendants' Contamination of Groundwater, Surface Water, Drinking Water, Air and Soil**

96. For decades, Defendants knew or should have known of the severe and adverse health and environmental effects and impacts of PFAS and other toxins.

97.   Despite that knowledge, Defendants continued to use PFAS and other toxins in products and release them into the environment.

98.   In 2006, the NJDEP conducted its first statewide occurrence study of PFAS in drinking water.

99.   That study revealed that 65% of sampled drinking water sources had PFOA compounds present, and 30% had PFOS compounds present.

100.   In the samples tested, PFOA was detected up to 100 ppt, PFOS was detected up to 43 ppt, and PFNA was detected up to 96 ppt.

101.   NJDEP sampled 992 private wells as of June 2018 for PFAS and detected the following:

   a.   PFOA in 427 wells (43%) with 284 of those wells having levels of PFOA exceeding the proposed MCL for PFOA; and

   b.   PFOS in 304 wells (31%) with 40 of those wells having levels of PFOS exceeding the proposed MCL for PFOS.

102.   400 of those sampled wells were sampled as part of the remedial investigation emanating from Solvay's West Deptford facility.

103.   Studies show that exposure to PFAS have the capacity to cause *inter alia* testicular cancer, kidney cancer, liver cancer,

autoimmune disorders, endocrine disorders, genetic damage,
developmental birth defects to fetuses, developmental defects to
breastfed babies, reduced vaccine response, increased cholesterol,
and increased liver enzymes.

104. The routes of exposure to which Plaintiff was exposed to
the relevant toxins include the ingestion of drinking water.

105. The routes of exposure to which Plaintiff was exposed to
the relevant toxins include inhalation of vapors and particulate
matter, and dermal contact and skin absorption.

106. Defendants' misconduct, (both individually and
collectively) and the resulting wrongful exposures, proximately
caused Plaintiff's injuries and damages as described above.

107. As a consequence, each Defendant is individually and
jointly and severally liable to Plaintiff for both compensatory
and punitive damages.

### Count I: Negligence

### Plaintiff v. All Defendants and
### John Doe Entities #1-20

108. The allegations contained in all preceding paragraphs
are incorporated herein as if fully restated.

109. Defendants knew or should have known that the use of
PFAS and/or the discharge of PFAS and other toxins into the air,
soil, groundwater and drinking or household water are hazardous to
human health and the environment.

21

110. Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to discharge PFAS and other toxins into the environment in close proximity to surrounding residential communities, including the Property.

111. Defendants had a duty to take all reasonable measures to ensure that PFAS and other toxins would be effectively contained and not discharged into the surrounding environment.

112. Defendants had a duty to operate and manage their facilities and related wastes in such a way as to not create a nuisance or dangerous condition that could cause injury or damage to human health and the environment.

113. Defendants further had a duty to ensure that the manufacturing processes that they chose to employ did not unreasonably endanger the drinking water relied upon by residents in the surrounding community, including those residing on the Property.

114. Defendants breached the above-stated duties by unreasonably disposing of PFAS and other toxins in a manner which made it foreseeable that they would enter the environment, specifically but not limited to the groundwater, exposing nearby residents, including Plaintiff, who relied upon the groundwater for drinking and household water supply.

115. Defendant 3M had a duty to warn users of their PFAS and other relevant products of the dangers of releasing PFAS and other relevant toxins into the environment.

116. Defendant 3M breached the above-stated duty by failing to adequately warn and provide sufficient instructions to purchasers such as Defendants Solvay, Arkema, DuPont, Chemours, and John Doe Entities #1-20, to avoid discharging PFAS and other relevant toxins into the environment where it was likely to enter the environment including the soil, air, and water including groundwater and be inhaled, absorbed and/or ingested by residents including those residing at the Property and others in the surrounding communities.

117. Defendant 3M further breached a duty by neglecting to inform itself of the improper manner in which its purchasers, including the other Defendants mishandled highly toxic 3M products.

118. As a direct and proximate result of these acts and omissions, Defendants individually and collectively wrongfully caused the environment to be contaminated with PFAS and other toxins, thereby exposing Plaintiff to these chemicals and substances, and causing a direct injury to Plaintiff.

119. All Defendants contributed to the contamination of the environment with PFAS and other harmful substances, and all

23

subsequently contributed to Plaintiff's exposure to these chemicals, thereby causing injury to Plaintiff.

120. The acts and omissions of all Defendants were negligent, and as a result, Plaintiff has suffered and/or will in the future suffer damage in the form of bodily injury, emotional distress, economic loss, medical expenses and was otherwise damaged, for which Defendants are liable.

WHEREFORE, Plaintiff requests that this Court enter judgment, jointly and severally, against Defendants for compensatory, punitive, and non-compensatory damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

### Count II: Gross Negligence and Recklessness

### Plaintiff  v. All Defendants and
### John Doe Entities #1-20

121. The allegations contained in all preceding paragraphs are incorporated herein as if fully restated.

122. At all relevant times, Defendants, as detailed above, committed acts and omissions with respect to PFAS and other toxins with actual malice and/or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions and/or with gross negligence.

123. Specifically, Defendants caused, permitted, and allowed the release of PFAS and other toxins into the environment

including the air, water, and soil, including the drinking water serving the Property, constituting an entire want of care and a conscious indifference to the rights, welfare, safety, and health of Plaintiff, such that Defendants' acts constitute gross negligence or reckless, willful or wanton misconduct.

124. Such conduct was motivated by greed in an effort to maximize profit with disregard to their duties and responsibilities to the public and to Plaintiff.

125. All Defendants contributed to the contamination of the environment with PFAS and other toxins, and all subsequently contributed to the exposures and injuries alleged herein.

126. Defendants' conduct involved deliberate acts or omissions with knowledge of a high degree of probability of harm to the Plaintiff  and an attendant reckless indifference to Plaintiff's health, safety, and welfare.

127. At all material times hereto, Defendants knew or should have known that their PFAS and other toxins would contaminate the environment including the air, soil, and groundwater and contaminate the drinking and household water of residents in surrounding communities, including Plaintiff's.

128. At all material times hereto, Defendants knew or should have known that PFAS and other toxins were hazardous substances and the reckless, and/or wanton and willful discharge of those chemicals into the environment and surrounding communities would

eventually reach the Property, soil, air, and drinking and household water wells thus exposing Plaintiff to high and injurious concentrations of the hazardous chemicals.

129. At all material times hereto, Defendants knew or should have known of the health and environmental impacts of PFAS and other toxins for decades but continued to use them in products and release them into the environment.

130. At all material times hereto, Defendants knew that PFOA and PFOS and other toxins were harmful to people and the environment based on its own studies.

131. At all material times hereto, despite actual or constructive knowledge of its chemicals' toxicity to humans and the environment, Defendants proactively sought to conceal that information from the public.

132. At all material times hereto, despite actual or constructive knowledge of their chemicals' toxicity to humans and the environment, Defendants proactively misrepresented the chemicals' hazardous properties, including knowingly and purposefully withholding material information from regulators and governmental agencies.

133. At all material times hereto, even after Defendants acquired actual knowledge that it was causing groundwater, soil, air, and drinking water contamination and thus exposing nearby residents to its PFAS and other toxins, including Plaintiff,

Defendants continued their operations and continued discharging these toxins into the environment and exposing residents in surrounding communities, including Plaintiff, in reckless and conscious disregard for the serious health and safety risks associated with such exposure.

134. At all material times hereto, Defendants committed acts and omissions with respect to PFAS and other toxins with actual malice and/or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

135. At all material times hereto, Defendants knowingly, continuously, and with conscious indifference to the rights of residents in surrounding communities, including Plaintiff, to have access to clean air, soil, water, and drinking water, caused, allowed, or permitted the discharge of large quantities of PFAS and other toxins into the environment, air, soil, and groundwater, had no justification for doing so, and made no effective effort to alleviate the problem.

136. Such conduct was motivated by greed and taken in deliberate and knowing disregard of Defendants' duties to Plaintiff and all similarly situated individuals.

137. Defendants' acts and omissions as set forth in the preceding paragraphs demonstrate their reckless and conscious disregard of the health, safety, and welfare, of residents in the community, including Plaintiff.

138. As a direct and proximate result of Defendants' conscious and deliberate disregard for the health, safety, and welfare of residents in surrounding communities, including Plaintiff, Plaintiff suffered and continues to suffer severe and permanent personal injuries and other damages, both economic and noneconomic, as set forth above.

139. The aforesaid conduct of Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of residents in surrounding communities, including Plaintiff, thereby warranting an award of punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future.

140. Defendants' actions showed willful misconduct, malice, fraud, wantonness, and/or oppression, and demonstrates conscious indifference to the consequences.

141. All Defendants' conduct demonstrated a willful and wanton, malicious and reckless disregard of the rights of Plaintiff so as to warrant the imposition of punitive damages.

WHEREFORE, Plaintiff requests that this Court enter judgment, jointly and severally, against Defendants for compensatory, punitive, and non-compensatory damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

**Count III:**

**Private Nuisance, Plaintiff v. Clemente, Solvay,
Arkema, DuPont, Chemours and John Doe Entities #1-20**

142. The allegations contained in all preceding paragraphs
are incorporated herein as if fully restated.

143. Defendants acts and omissions with respect to the
release of PFAS and other toxins in the environment resulted in
the contamination of the air, soil, and water, including but not
limited to Plaintiff's water supply, and have thus unreasonably
interfered with Plaintiff's use and enjoyment of its property,
invading the home and body of Plaintiff.

144. Defendants acts and omissions with respect to the
release of PFAS and other toxins have made Plaintiff's water
supply unfit for consumption and other domestic purposes.

145. Defendants' unreasonable interference with the use and
enjoyment of Plaintiff's property constitutes a continuous
invasion of Plaintiff's rights.

146. Defendants, Clemente, Solvay, Arkema, DuPont and
Chemours, all contributed to the contamination of the environment
with PFAS and other toxins, and all substantially contributed to a
private nuisance sustained by Plaintiff .

WHEREFORE, Plaintiff requests that this Court enter judgment,
jointly and severally, against Defendants for compensatory,
punitive, and non-compensatory damages, together with interest,

costs, attorneys' fees, and all such other relief as the Court
deems proper.

### Count IV: Public Nuisance

#### Plaintiff v. Clemente, Solvay, Arkema, DuPont, Chemours and John Doe Entities #1-20

147. The allegations contained in all preceding paragraphs
are incorporated herein as if fully restated.

148. Defendants' conduct detailed above unreasonably
interfered with a right common to the general public, including
the public's right to be free from environmental contamination in
the air it breathes and water it drinks, and in which its members
bathe, shower, and swim.

149. Defendants' conduct detailed above unreasonably and
significantly interfered with the public health and public safety
by contaminating water, soil, and air with toxic and carcinogenic
chemicals.

150. Defendants' conduct was of a continuing nature, and/or
produced a long-lasting effect, and Defendants knew and/or had
reason to know that it would have a significant effect on the
public's rights.

151. Plaintiff  suffered harm of a kind different from that
suffered by other members of the public exercising the right
common to the general public.

30

152. Defendants' acts and omissions with respect to the release of PFAS and other toxins in the environment including the air, soil, and water resulted in the contamination of Plaintiff's home and private water supply.

153. Defendants' unreasonable interference with the use and enjoyment of Plaintiff's property constitutes a continuous invasion of Plaintiff's rights.

154. Defendants, Clemente, Solvay, Arkema, DuPont and Chemours all contributed to the contamination of the environment with PFAS and other toxins, and all subsequently contributed to the public nuisance imposed on Plaintiff.

155. Defendants' creation of a continuing public and/or private nuisance has damaged Plaintiff in the form of bodily injury, emotional distress, and other damages all of a type not common to the general public, for which Defendants are liable to Plaintiff.

WHEREFORE, Plaintiff requests that this Court enter judgment, jointly and severally, against Defendants for compensatory, punitive, and non-compensatory damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

## Count V: Past and Continuing Trespass

### Plaintiff  v. Clemente, Solvay, Arkema, DuPont, Chemours and John Doe Entities #1-20

156. The allegations contained in all preceding paragraphs are incorporated herein as if fully restated.

157. As related above, Plaintiff is the owner and/or possessor of real property and reside or resided on those properties.

158. Defendants negligently, recklessly, and/or intentionally failed to properly control, apply, use and/or dispose of PFAS and other toxins resulting in its discharge into the environment entering, invading, intruding, and injuring the rights of Plaintiff to possess and enjoy properties.

159. Plaintiff has not consented and does not consent to the contamination alleged herein, and Defendants knew or reasonably should have known that Plaintiff would not consent to such.

160. Defendants, Clemente, Solvay, Arkema, DuPont and Chemours, all contributed to the contamination of the environment with PFAS and other toxins, and all subsequently contributed to the past and continuing trespass imposed on Plaintiff.

161. As a direct and proximate result of Defendants' acts and omissions as alleged herein, the soil and drinking water wells on Plaintiff's properties have been contaminated with PFAS, and other toxins, causing significant personal injuries and damage,

including actual, consequential, and nominal damages as described above.

WHEREFORE, Plaintiff requests that this Court enter judgment, jointly and severally, against Defendants, other than 3M, for compensatory, punitive, and non-compensatory damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

**Count VI: Strict Liability (Abnormally Dangerous Activities)**

**Plaintiff  v. Clemente, Solvay, Arkema, DuPont, Chemours, 3M and John Doe Entities #1-20**

162. The allegations contained in all preceding paragraphs are incorporated herein as if fully restated.

163. At all relevant times, Defendants, Clemente, Solvay, Arkema, DuPont, Chemours, 3M, and John Doe Entities #1-20 sold, disposed of, discharged, and emitted hazardous substances from their facilities which they owned, controlled, and operated.

164. As a result of Defendant 3M selling, and Defendants, Clemente, Solvay, Arkema, DuPont, Chemours and John Doe Entities #1-20 discharging, and Clemente storing such substances from and on their sites, the groundwater under Plaintiff's Property was contaminated with hazardous substances, causing harm to Plaintiff.

165. The manufacturing, utilization, disposal, and discharge of PFAS and other toxins constitute abnormally dangerous activities that introduce an unusual danger in the community.

166. Defendants' activities in selling, manufacturing, utilizing, disposing, storing, and discharging of these products presented a high degree of risk of harm to the person, land, and/or chattels of others.

167. It was likely that the harm resulting from Defendants' activities would be great.

168. The exercise of reasonable care does not eliminate the risk of harm posed by Defendants' activities.

169. Defendants' activities are not a matter of common usage in the areas in which they were carried out.

170. Defendants' activities were inappropriate to the locations in which they were carried out.

171. The dangerous attributes of and risk posed by Defendants' activities outweighed their value to the community.

172. The manufacturing, utilization, disposal, and discharge of these products are not matters of common usage in the areas where these activities were carried out.

173. At all relevant times, the risk of the Defendants' abnormally dangerous activities outweighed the value to the community.

174. Defendants' acts and omissions in selling, manufacturing, utilizing, disposing, and discharging hazardous chemicals proximately caused the contamination to Plaintiff's

Property and injuries to Plaintiff, making them strictly liable for the harm caused by such contamination.

175. Defendants, Clemente Solvay, Arkema, DuPont, 3M and Chemours all foreseeably contributed to the contamination of the environment with PFAS and other toxins, and all subsequently contributed to Plaintiff's exposure to these chemicals, thereby causing injury to Plaintiff.

176. As a direct and proximate result of Defendants' discharges of hazardous substances and contaminants, Plaintiff has and will continue to suffer damages.

WHEREFORE, Plaintiff requests that this Court enter judgment, jointly and severally, against Defendants for compensatory, punitive, and non-compensatory damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

### Count VII: Strict Liability (Failure to Warn)

### Plaintiff  v. 3M and John Doe Entities #1-20

177. The allegations contained in all preceding paragraphs are incorporated herein as if fully restated.

178. Defendant 3M developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied PFAS and other toxins for sale and sold such products to Defendants DuPont, Chemours, Solvay, Arkema, and John Doe Entities #1-20 in the ordinary course of their businesses.

179. Upon information and belief, Defendants DuPont, Chemours, Solvay, Arkema, and John Doe Entities #1-20 utilized the PFAS chemicals and other toxins supplied by Defendant 3M in a reasonably foreseeable and intended manner.

180. The PFAS and other toxins sold by Defendant 3M were unreasonably dangerous to residents of surrounding communities, including Plaintiff, without adequate warnings and instructions to prevent discharge of PFAS and other toxins into the environment and accumulation inside the bodies of residents in surrounding communities, including Plaintiff.

181. Defendant 3M knew or should have known that the PFAS and other toxins they sold would be discharged into the environment and cause contamination of the water supply of residents and accumulation in the blood serum and bodily tissues of residents living in the surrounding communities, including Plaintiff.

182. Defendant 3M failed to advise Plaintiff as well as Defendants Solvay, Arkema, DuPont, Chemours, and John Doe Entities #1-20 which were purchasers, users or those foreseeably exposed, to their PFAS and other toxins about the risks these products posed to foreseeable third parties, such as Plaintiff, and about techniques that could be employed to reduce or eliminate these risks.

183. Defendant 3M had actual knowledge of the health hazards associated with PFAS and other toxins through both animal studies

conducted by researchers employed or contracted by such Defendants and though experience with Defendant's own workers, but, upon information and belief, failed to share such information with purchasers, users or those foreseeably exposed to their products, including Plaintiff, Defendants, DuPont, Chemours, Solvay, Arkema, and John Doe Entities #1-20, or with governmental agencies.

184. Defendant 3M acted with reckless indifference to the health and safety of residents in surrounding communities where its PFAS and other toxins were used by failing to provide adequate warnings of the known dangers of such products when discharged into the environment and ingested by nearby residents, such as Plaintiff.

185. Defendant 3M had a duty to warn users of their PFAS products and other toxins of the dangers of releasing PFAS and other toxins into the environment.

186. Defendant 3M breached the above-stated non-delegable duty by failing to adequately warn and provide sufficient instructions to purchasers such as Defendants, Solvay, Arkema, DuPont, Chemours, and John Doe Entities #1-20, to avoid discharging PFAS and other toxins into the environment where it was likely to enter groundwater and be ingested by residents in surrounding communities, including Plaintiff.

187. As a direct and proximate result of Defendant 3M's acts and omissions, Plaintiff has and will continue to suffer damages.

WHEREFORE, Plaintiff requests that this Court enter judgment, jointly and severally, against Defendant, 3M, for compensatory, punitive, and non-compensatory damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

### Count VIII: Strict Liability (Defective Design)

### Plaintiff v. 3M and John Doe Entities #1-20

188. The allegations contained in all preceding paragraphs are incorporated herein as if fully restated.

189. Defendant 3M designed, manufactured, and sold PFAS and other toxins that were used at the Chambers Works and West Deptford facilities, and elsewhere by Defendants including DuPont, Chemours, Solvay, Arkema and John Doe Entities #1-20 and disposed of by Clemente.

190. As a manufacturer and seller of PFAS and other toxins, Defendant 3M had a duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses.

191. Defendant 3M owed that duty to direct users of its products, to reasonably foreseeable users of its products, and also to any person who might reasonably be expected to come into contact with these products, such as Plaintiff.

192. Defendant 3M's PFAS products and other toxins were used in a reasonably foreseeable manner and without substantial change

38

in the condition of such products and were defective and unfit for their reasonable use.

193. Defendant 3M knew or should have known that use of its PFAS and other toxins used by Defendants DuPont, Chemours, Solvay, Arkema, and John Doe Entities #1-20 would result in the spillage, discharge, and/or release of PFAS and other toxins into the environment and would contaminate the environment including the groundwater, air, soil, and drinking water of surrounding communities, including Plaintiff's.

194. Defendant 3M knew or should have known that its PFAS and other toxins would eventually come into contact with and harm residents in surrounding communities, including Plaintiff.

195. Defendant 3M's PFAS products were defective in design and unreasonably dangerous because, among other things:

    a.    PFAS and other toxins cause extensive and persistent contamination when used in a reasonably foreseeable and intended manner; and

    b.    PFAS and other toxins contaminated the environment, including the air, soil, and groundwater, which are the sources of drinking water to citizens in the surrounding communities, including Plaintiff, poses significant threats to their health, safety, and welfare.

196. At all relevant times, Defendant 3M's PFAS and other toxins which they designed, manufactured, and sold were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

197. The foreseeable risk to public health and welfare, including that of Plaintiff's, posed by Defendant 3M's PFAS and other toxins outweighed the cost to Defendant, 3M, of reducing or eliminating such risk.

198. Defendant 3M knew or should have known about reasonably safer and feasible alternatives to PFAS and other toxins.

199. As a direct and proximate result of Defendant 3M's acts and omissions, Plaintiff has and will continue to suffer damages.

WHEREFORE, Plaintiff requests that this Court enter judgment, jointly and severally, against Defendant, 3M, for compensatory, punitive, and non-compensatory damages, together with interest, costs, attorneys' fees and all such other relief as the Court deems proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demand a trial by jury on all issues so triable.

SZAFERMAN, LAKIND,
  BLUMSTEIN & BLADER, P.C.

By: /s/ Arnold C. Lakind
        Arnold C. Lakind, Esq.

Dated: December 13, 2021

### DESIGNATION OF TRIAL COUNSEL

Steven J. Phillips is hereby designated as trial counsel.

### CERTIFICATION

Arnold C. Lakind, of full age, hereby certifies that pursuant to Rule 4:5-1:

1.    The matter in controversy is not the subject of any other action pending in any court or of any pending arbitration proceeding and no other action or arbitration proceeding is contemplated.  Counsel has however filed similar Complaints in this Court against these Defendants for a different Plaintiff:

> Philipp v. Clemente, Inc.; Anthony Clemente, Inc.; and John Does 1 to 10, Docket NO. SLM-L-181-21.
>
> Allen v. Clemente, Inc.; Anthony Clemente, Inc.; and John Does 1 to 10, Docket NO. SLM-L-198-21.
>
> Mesogianes v. Clemente, Inc.; Anthony Clemente, Inc.; and John Does 1 to 10, Docket NO. SLM-L-199-21.

2.    There are no other parties known to Plaintiff at this time who should be joined in this action to the undersigned's best knowledge.

3.    I certify, pursuant to N.J. Court Rule 1:38-7(c) that confidential personal identifiers have been redacted from any documents now submitted to the court, and will be redacted from

all documents submitted in the  future in accordance with Rule

1:38-7(b).

By: /s/ Arnold C. Lakind
    Arnold C. Lakind, Esq.

Dated: December 13, 2021